595 F.2d 1231
 Joseph MARCERA and John Dillman, Individually and on behalf
of all others similarly situated,
Plaintiffs-Appellants-Cross-Appellees,
v.
Stephen CHINLUND, Joseph Wasser and Dorothy Wadsworth,
Individually and in their official capacities as
members of the New York State Commission
of Correction, Defendants-Appellees,
and
William Lombard, Individually and in his official capacity
as Sheriff of Monroe County and on behalf of all
other persons similarly situated,
Defendant- Appellee-Cross-Appellant.
 Nos. 359, 360, Dockets 78-2081, 78-2090.
 United States Court of Appeals,
Second Circuit.
 Argued Dec. 6, 1978.
Decided Feb. 27, 1979.
Certiorari Granted and Judgment Vacated June 4, 1979.
See 99 S.Ct. 2833.
 
 Ian C. DeWaal, Rochester, N. Y. (Monroe County Legal Assistance Corp., Rochester, N. Y., of counsel), for plaintiffs-appellants-cross-appellees.
 Patricia C. Armstrong, Dept. of Law of N. Y., New York City (Louis J. Lefkowitz, Atty. Gen. of N. Y., New York City, of counsel), for defendants-appellees Chinlund, Wasser, and Wadsworth.
 Joseph C. Pilato, Rochester, N.Y. (John D. Doyle, County Atty., Rochester, N. Y., of counsel), for defendant-appellee-cross-appellant Lombard.
 Before KAUFMAN, Chief Judge, and SMITH and VAN GRAAFEILAND, Circuit Judges.
 IRVING R. KAUFMAN, Chief Judge:
 
 
 1
 Recent years have witnessed an explosion of litigation testing the rights of prisoners who have not been convicted of a crime but are merely held in custody to ensure their attendance at trial. A recurrent issue has been the extent to which these pretrial detainees must be permitted "contact visits," and, since 1974, we have repeatedly held that due process forbids denying detainees the right "to shake hands with a friend, to kiss a wife, or to fondle a child," Rhem v. Malcolm ("Rhem I"), 371 F.Supp. 594, 626 (S.D.N.Y.), Aff'd, 507 F.2d 333 (2d Cir. 1974). Accord, Wolfish v. Levi, 573 F.2d 118, 126 n. 16 (2d Cir.) (recognizing First Amendment basis to right), Cert. granted, --- U.S. ----, 99 S.Ct. 76, 58 L.Ed.2d 107 (1978); Rhem v. Malcolm ("Rhem II"), 527 F.2d 1041, 1043 (2d Cir. 1975).
 
 
 2
 Before the instant litigation, however, the cases have focused on one institution at a time, and our decrees have had a practical impact only on the inmates of the particular facility under consideration in each suit. Thus, the sheriffs of 47 of New York's 62 counties continue to deny pretrial detainees in their custody[1] the contact with friends and loved ones that Rhem I established as their due. At Monroe County Jail, for example, which was built in 1970 and is considered one of the most modern jails in the state, the detainee and his visitor are kept apart by a ceiling-high wall. They see each other only through a small plexiglass window, and they talk by telephone. The visiting facilities at the other 46 jails whose inmates are denied contact visits are similar.
 
 
 3
 New York State officials have not been unmoved by the plight of the detainees in the county jails. In 1976, following our decisions in Rhem I and Rhem II, the State Corrections Commission promulgated regulations requiring each facility to adopt a contact visitation program. 9 N.Y.Codes, Rules & Regs. §§ 7008.1 to .8 (1976).[2] The sheriffs, however, viewed this action by the Commission as infringing on their prerogatives as administrators of the jails, and they secured a state court injunction against enforcement of the regulations. McNulty v. Chinlund, 62 A.D.2d 682, 406 N.Y.S.2d 558 (3d Dep't 1978), Aff'g 89 Misc.2d 713, 392 N.Y.S.2d 790 (Sup.Ct., Albany Co. 1977).[3]
 
 
 4
 In November 1976, shortly after the Corrections Commission's regulations were promulgated, Joseph Marcera and John Dillman, two inmates of the Monroe County Jail, commenced this action to enforce their right to contact visitation. Seeking the broadest possible vindication of this right, they sought to maintain the suit as a double-edged class action under Rule 23 of the Federal Rules of Civil Procedure. Specifically, on behalf of themselves and a plaintiff class of pretrial detainees throughout the state, they sought relief against a defendant class of 42 sheriffs who deny contact visits in their jails.[4] Sheriff William Lombard of Monroe County was named as representative of the proposed defendant class.[5] Plaintiffs promptly moved before Judge Burke for certification of plaintiff and defendant classes, and they also requested preliminary injunctive relief to facilitate implementation of contact visitation at the 42 affected jails.
 
 
 5
 On a prior appeal, we held that Judge Burke erred in denying the relief sought out of hand, without holding a hearing. Marcera v. Chinlund,565 F.2d 253 (2d Cir. 1977) (Per curiam ). Although we stated that plaintiffs had raised "substantial claims of deprivations of (constitutional) rights," the virtually nonexistent record precluded us from ruling on the merits. Id. at 255. After the required hearing, the district judge determined that plaintiffs had demonstrated neither irreparable injury nor likelihood of success on the merits. In addition, he found that significant differences in jail construction, staffing, and inmate population among the 42 counties precluded Sheriff Lombard from adequately protecting the interests of the absentee defendants. Judge Burke therefore declined to certify either a defendant class or a statewide plaintiff class,[6] and he denied most of the requested preliminary relief. He did, however, certify a plaintiff class consisting of Monroe County inmates, and he ordered Sheriff Lombard to ask the County Legislature for funds with which to implement a contact visitation program.[7]
 
 
 6
 The sheriff appeals this directive, and plaintiffs appeal the denial of statewide class certification[8] and the refusal to enter a more comprehensive preliminary injunction. Because we believe the district judge has misconceived both the nature of the constitutional issues and the appropriate procedural response, we reverse the order denying class certification and direct the district court to grant the interim relief requested by plaintiffs.[9] To avoid further shuttling between this court and the district court, we shall also attempt to provide some guidance for the future conduct of the litigation.
 
 I. THE CONSTITUTIONAL FRAMEWORK
 
 7
 As we noted earlier, we have repeatedly held that it is unconstitutional to deny inmates regular contact visits while they are incarcerated awaiting trial. This right is founded on the bedrock of our criminal jurisprudence: an individual accused of a crime is presumed innocent, and may not be punished, until a jury finds him guilty beyond a reasonable doubt. Accordingly, pretrial detainees may be subjected only to those restraints on their liberty that inhere in the confinement itself or are clearly justified by the "compelling necessities of jail administration." E. g., Wolfish v. Levi, supra, 573 F.2d at 124.
 
 
 8
 Moreover, it is equally well established that these "compelling necessities" do not include cost or mere administrative inconvenience, for "(i)nadequate resources (or) finances can never be an excuse for depriving detainees of their constitutional rights," Detainees of Brooklyn House of Detention v. Malcolm, 520 F.2d 392, 399 (2d Cir. 1975). Accord, Rhem II, supra, 527 F.2d at 1043-44; See, e. g., Wolfish v. Levi, supra, 573 F.2d at 124; Todaro v. Ward, 565 F.2d 48, 54 n. 8 (2d Cir. 1977). To be sure, the legitimate and vital interests of jail security may be protected, but only by rules carefully tailored to cause no more restrictions of inmates' rights than essential. Thus, reasonable classification schemes, designed to weed out those detainees who would present intolerable security risks if granted contact visits, are permissible. Rhem I, supra, 507 F.2d at 338; 371 F.Supp. at 626; See id. at 603-04, 617-20. Blanket prohibitions, however, are banned. See Rhem II, supra, 527 F.2d at 1043; Miller v. Carson, 563 F.2d 741, 748-49 (5th Cir. 1977); Detainees of Brooklyn House of Detention v. Malcolm,421 F.Supp. 832 (E.D.N.Y.1976). In sum, it is too late in the day to suggest that it does not offend the Constitution not to permit pretrial detainees contact visits. Judge Burke clearly erred in finding that plaintiffs suffered no irreparable injury and were unlikely to succeed on the merits, and his failure to award effective interim relief was thus an abuse of discretion. The true issues on this appeal concern not the right to relief but the scope of relief; not whether to enter an injunction but against whom and to what extent.
 
 II. CLASS CERTIFICATION
 
 9
 We turn, therefore, to the district court's rulings on the class certification motions. Under Fed.R.Civ.P. 23, of course, a moving party must demonstrate that the putative class not only meets each of the four criteria of subsection (a) but also fits one of the three categories set forth in subsection (b). See, e. g., Green v. Wolf Corp., 406 F.2d 291, 298 (2d Cir. 1968), Cert. denied, 395 U.S. 977, 89 S.Ct. 2131, 23 L.Ed.2d 766 (1969). These twin requirements apply equally to plaintiff and defendant classes. See, e. g., Research Corp. v. Pfister Associated Growers, Inc., 301 F.Supp. 497 (N.D.Ill.1969), Appeal dismissed sub nom. Research Corp. v. Asgrow Seed Co., 425 F.2d 1059 (7th Cir. 1970); Note, Defendant Class Actions, 91 Harv.L.Rev. 630, 633 (1978). In this case, however, there is an additional hurdle to overcome. Unless the custodians of the 41 affected jails outside Monroe County are members of a proper defendant class, it would be an exercise in futility to define the plaintiff class to include detainees in counties other than Monroe. Indeed, because there is surely no case or controversy between Sheriff Lombard and non-Monroe detainees, to certify a statewide plaintiff class and not a corresponding defendant class would violate Article III as well. See generally Developments in the Law Class Actions, 89 Harv.L.Rev. 1318, 1460-63 & nn. 47 & 48 (1976) (citing cases). Thus, we first consider Judge Burke's refusal to certify a defendant class.
 
 A. Defendant Class
 
 10
 There is little doubt that the 42 sheriffs constitute a group sufficiently large to meet the numerosity requirement of Rule 23(a)(1). See 1 H. Newberg, Class Actions 171-76 (1977), and cases collected therein. Moreover, the constitutionality of denying contact visits is a "question of law . . . common to the class" of sheriffs within the meaning of 23(a)(2). And although a literal reading of the rule might indicate otherwise, See Note, Federal Rules of Civil Procedure 23: A Defendant Class Action with a Public Official as the Named Representative, 9 Val.L.Rev. 357, 390-96 (1975), it is now settled that 23(b)(2) is an appropriate vehicle for injunctive relief against a class of local public officials. E. g., Lee v. Washington, 390 U.S. 333, 88 S.Ct. 994, 19 L.Ed.2d 1212 (1968) (Per curiam ), Aff'g 263 F.Supp. 327 (M.D.Ala.1966) (3-judge court); Lynch v. Household Finance Corp., 360 F.Supp. 720 (D.Conn.1973) (3-judge court); Note, Supra, 9 Val.L.Rev. at 391 & n. 128; Note, Defendant Class Actions, supra, 91 Harv.L.Rev. at 634.[10] The propriety of certifying a defendant class in this case depends, therefore, on whether Sheriff Lombard's defenses are typical of those of the class, and whether he can adequately protect the interests of the absentee sheriffs. Not surprisingly, Lombard has vigorously asserted that he passes neither test, and the district court agreed. We conclude, however, that the sheriff's defenses are indeed typical of those of his colleagues, and that he will continue to protect their interests as firmly and vigorously as he has in the litigation thus far.
 
 1. Typicality of Defenses
 
 11
 Lombard presents two interrelated defenses. He asserts, first, that contact visits pose an intolerable threat to the security of the Monroe County Jail. In addition, he contends that any security arrangements he could make that would provide adequate protection against the twin evils of inmate violence and introduction of contraband would require him to spend money he does not have and has no hope of obtaining.
 
 
 12
 There can be little question that these defenses are familiar and, indeed, are always put forward as justification for denials of contact visits. The demons cost, violence, and contraband have been evoked in every reported contact visitation case. See, e. g., Rhem I, supra; Miller v. Carson, supra, 563 F.2d at 748-49; O'Bryan v. County of Saginaw, Mich., 437 F.Supp. 582, 595, 598-99 (E.D.Mich.1977). Moreover, Lombard has not cited, nor have we discovered, a single case in which a corrections official raised a defense other than those advanced here. In any event, we need not speculate as to possible defenses the sheriffs might raise, for there is hard evidence available on the matter. Fifty-one of New York's sheriffs joined in bringing the McNulty action to enjoin enforcement of the State Correction Commission's contact visitation regulations, and the principal grounds they asserted were cost and security. See 406 N.Y.S.2d at 561.[11]
 
 
 13
 Lombard contends, nevertheless, that a single sheriff's defenses cannot possibly be typical of the entire class because of the substantial variations among detention facilities with respect to architecture, staffing, and inmate population. How, he asks, can the problems of Monroe County Jail a modern, urban, maximum-security installation with a capacity of 325 inmates be comparable to those of the small jails in rural counties such as Wyoming? The short answer to this argument is that it is the settled law of this Circuit that considerations of cost, architecture, or administrative convenience are simply insufficient to justify blanket denials of contact visits. See Part I Supra. The size of the county and the nature of its jail are therefore irrelevant to the issue of liability. And although, as we discuss in Part III Infra, these considerations may be significant in fashioning a decree, it is solidly established that a possible need for individual relief should not deter a court from certifying a class at that stage of the proceedings when the court is engaged only in resolving the merits of the plaintiffs' claims. See, e. g., Green v. Wolf Corp., supra, 406 F.2d at 300-01; Samuels v. University of Pittsburgh, 538 F.2d 991 (3d Cir. 1976) (Clark, J.); In re Master Key Antitrust Litigation, 70 F.R.D. 23 (D.Conn.1975), Appeal dismissed, 528 F.2d 5 (2d Cir. 1976). This principle is by no means limited to plaintiff classes. See In re Gap Stores Securities Litigation, 79 F.R.D. 283 (C.D.Cal.1978); United States v. Trucking Employers, Inc., 75 F.R.D. 682, 689 n.2 (D.D.C.1977). Should the need to restructure the litigation arise in later stages, subsections (d) and (c)(4) of Rule 23 provide the trial judge with ample discretion to respond flexibly. We conclude, therefore, that the differences among jails do not render the cost and security defenses raised by Sheriff Lombard atypical of those of his class.
 
 2. Adequacy of Representation
 
 14
 In contrast with representatives of plaintiff classes, named defendants almost never choose their role as class champion it is a potentially onerous one thrust upon them by their opponents. See generally Note, Supra,91 Harv.L.Rev. at 648-50. It is not surprising, therefore, that Lombard opposes certification on the ground that, as an unwilling representative, he is unlikely to protect the interests of absentees. But courts must not readily accede to the wishes of named defendants in this area, for to permit them to abdicate so easily would utterly vitiate the effectiveness of the defendant class action as an instrument for correcting widespread illegality. Rule 23(a) (4) does not require a willing representative but merely an adequate one. It will often be true that, merely by protecting his own interests, a named defendant will be protecting the class. Where, as here, the legal issues as to liability are entirely common to members of the defendant class, there is little reason to fear unfairness to absentees. See Note, Supra, 91 Harv.L.Rev. at 643-44. In this litigation, Sheriff Lombard has vigorously and ably defended a difficult position. A measure of his resourcefulness as an advocate for the class is the fact that today more than two years after this suit was commenced and in the face of clear and controlling cases to the contrary the 42 county jails are still pursuing the visitation policies of their choice. Under these circumstances, his opposition to certification merits only "token weight." Research Corp. v. Pfister Associated Growers, Inc., supra, 301 F.Supp. at 499. We believe, therefore, that the district court erred in denying the motion to certify the statewide defendant class.B. Plaintiff Class
 
 
 15
 We may dispose of the remaining certification issue briefly. In certifying a limited plaintiff class, the district court clearly found that the requirements of Rule 23(a) were met as to the class of Monroe County inmates. We agree.[12] Moreover, it is well established that civil rights actions are the paradigmatic 23(b)(2) class suits, for they seek classwide structural relief that would clearly redound equally to the benefit of each class member. See, e. g., Alliance to End Repression v. Rockford, 565 F.2d 975, 979 n.9 (7th Cir. 1977); Notes of Advisory Committee on Rules, 39 F.R.D. 69, 102 (1966); 1 H. Newberg, Supra, at 240. But we do not agree with the district court that the putative unfamiliarity of the plaintiff class attorneys with jails outside Monroe County should prevent certification of a statewide plaintiff class. We have already held that variations among jails are irrelevant to liability, and, even with respect to relief, the record already contains some evidence concerning non-Monroe County jails. Discovery of absentee class members, See United States v. Trucking Employers, Inc., 72 F.R.D. 101, 104-05 (D.D.C.1976), is available to fill what gaps remain. Accordingly, the district court should have granted the plaintiffs' motion for certification of a statewide plaintiff class.
 
 III. RELIEF
 
 16
 In considering the relief to be awarded the plaintiff class, we are mindful that there are compelling reasons for federal courts not to become enmeshed in the minutiae of day-to-day prison administration. Both the Supreme Court, in Procunier v. Martinez, 416 U.S. 396, 404-05 & n.9, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974), and we in Wolfish v. Levi, supra, 573 F.2d at 124, have recognized that "courts are ill equipped to deal with the increasingly urgent problems of prison administration and reform," 416 U.S. at 405, 94 S.Ct. at 1807. And where, as here, the litigation affects a substantial proportion of a state's jail facilities, we must be particularly sensitive to the dictates of federalism. Federal courts must not become surrogate Jail Superintendents for the State of New York.
 
 
 17
 Nevertheless, we have repeatedly and firmly declared that neither convenience of judicial administration nor concern for the delicacies of federal/state relations will excuse a failure to remedy clear constitutional violations. E. g., Wolfish, supra, 573 F.2d at 124; Todaro v. Ward,supra, 565 F.2d at 53-54. The judgment in this action must be adequate to redress the patently unconstitutional visiting procedures pursued by the defendant class.[13]
 
 
 18
 On this appeal, however, we are not in a position to direct entry of a final decree. The record clearly establishes the existence of constitutional violations by the defendant sheriffs, but it also suggests that there may be significant differences among the jails in architecture, staffing, and inmate population. Although these differences were irrelevant to the issue of liability, they assume importance in considering appropriate remedies, which may involve architectural changes, adjustments to security systems, and timetables for implementation. Recognizing that the persons best placed to determine how contact visitation should be implemented are the sheriffs themselves, plaintiffs asked that the district court preliminarily require submission of plans by each member of the defendant class. We believe this is appropriate, and the district court should grant this relief upon receipt of our mandate. The Corrections Commission has repeatedly offered technical assistance to counties implementing contact visits, and we trust that such aid is still available.[14]
 
 
 19
 Once the plans are submitted, the district court must determine whether the suit should continue to be maintained as a class action. Decertification under subsections (d) and (c)(4)(A) of Rule 23 is permissible if it appears that highly individualized relief is necessary in each county. The district court, however, ought not to take such action without considering all the alternatives, for there may be no need for extensive litigation with respect to each plan.
 
 
 20
 First, the district judge should consider any plan offering to implement contact visitation within one year. If he concludes that the proposal will in fact meet constitutional standards, the county submitting it should be permitted to have a consent decree entered embodying the offer. Even if the plans offered by the sheriffs do not resolve the litigation, there may be no need to fragment the lawsuit. It may be that formulation of relief against all the defendants will require only a small number of decrees. Useful models are provided by the Corrections Commission's abortive 1976 regulations and by the decrees issued in prior contact visitation cases, both in this Circuit and elsewhere. And documents produced in connection with the deposition of Chairman Chinlund of the State Corrections Commission indicate that the counties that established contact visitation programs in response to the Commission's 1976 regulations encountered little difficulty, either in effecting the change or in maintaining security thereafter.[15] Indeed, it is highly significant that, as Chairman Chinlund testified, the facilities already permitting contact visitation are typical, in terms of architecture, location, and other relevant factors, of the full spectrum of New York State's county jails. Pleas of special circumstances or extraordinary hardship, therefore, should be examined with care before it is concluded that decertification is warranted.
 
 
 21
 We are somewhat distressed with both the tone and content of our Brother Van Graafeiland's dissent in an area charged with so much emotion. Elsewhere in this opinion we have responded to several of his complaints, and we will not repeat them here. We note, however, that much of the dissent is a transparent attempt to set up straw men by altering today's holding. For example, whether pretrial detainees have a right to conjugal visits has not been presented to us, nor was that issue before us in Wolfish, supra. But, its mere mention is more likely to inflame than shed light. We believe it neither helpful nor relevant to the final solution of these difficult issues, involving intensified feelings, to resort to this type of argument. What is before us is the right of prisoners who have not been convicted of a crime to Contact visits physical contact "in a manner consistent with reasonable standards of public decency," N.Y.Codes, Rules & Regs. § 7008.6. The law of this Circuit regarding these visits is clear.
 
 
 22
 Moreover, it is hardly correct for the dissent to suggest that we do not provide the district court with sufficient guidance to carry out our mandate. A glance at both Part III of this opinion and the Appendix will demonstrate that, if anything, we erred on the side of over-inclusion, for we wished to provide Judge Burke the maximum possible assistance in managing the future stages of this litigation. In particular, we call attention to Part 7008.8 of the Corrections Commission regulations, printed in the Appendix. This regulation specifically addresses detainee classification schemes and the procedures for implementing them, and it provides a reasonable balance between detainees' rights and "the compelling necessities of jail administration," Wolfish, supra, 573 F.2d at 124. Whether the district court, aided by the parties, adopts Part 7008.8 In toto or not at all, we have hardly left it stranded in the wilderness without a compass.
 
 
 23
 The order of the district court is vacated[16] and the cause is remanded with instructions (a) to certify plaintiff and defendant classes as defined herein, (b) to enter the preliminary injunction requested by the plaintiffs, and (c) to conduct further proceedings in accordance with this opinion.
 
 APPENDIX:
 
 24
 NEW YORK CODES, RULES AND REGULATIONS, PART 7008
 
 
 25
 7008.1 Policy. (a) All prisoners confined in local correctional facilities are entitled to receive periodic visits.
 
 
 26
 (b) Consistent with the requirements of this Part, visits shall be permitted upon the request of a prisoner or a prospective visitor with the prisoner's consent.
 
 
 27
 7008.2 Visiting area. (a) A visiting area of sufficient size to meet the requirements of this Part shall be established and maintained in each facility.
 
 
 28
 (b) The visiting area shall be designed so as to allow physical contact between prisoners and their visitors.
 
 
 29
 7008.3 Availability of visits. (a) Each prisoner shall be entitled to at least two one hour visits each week.
 
 
 30
 (b) At least one visit each week shall be available to each prisoner between the hours of 9 a.m. and 5 p.m. on a weekday.
 
 
 31
 (c) At least one visit each week shall be available to each prisoner:
 
 
 32
 (1) between the hours of 5 p.m. and 9 p.m. on a weekday; or
 
 
 33
 (2) on a Saturday or Sunday at times not unduly disruptive of facility routine.
 
 
 34
 (d) Prisoners shall be permitted to visit with more than one visitor at the same time, with the maximum number of visitors to be determined by the chief administrative officer.
 
 
 35
 (e) Visitors shall be permitted to visit with more than one prisoner at the same time with the maximum number of prisoners to be determined by the chief administrative officer.
 
 
 36
 7008.4 Initial visit. (a) Each prisoner shall be entitled to receive a visit within 24 hours after his admission to a facility.
 
 
 37
 (b) If a visiting period scheduled pursuant to subdivisions (b) and (c) of section 7008.3 of this Part is not available within 24 hours after a prisoner's admission, arrangements shall be made to ensure that the initial visit required by subdivision (a) of this section is made available.
 
 
 38
 7008.5 Visitor identification and registration. (a) Consistent with the requirements of this Part, any properly identified person shall, with the prisoner's consent, be permitted to visit that prisoner.
 
 
 39
 (b) As used in this section, the term "properly identified person" shall mean a person who presents adequate proof as to his identity.
 
 
 40
 (c) Each visitor shall be required to enter in a facility visitors log:
 
 
 41
 (1) his name;
 
 
 42
 (2) his address;
 
 
 43
 (3) the date;
 
 
 44
 (4) the time of entry;
 
 
 45
 (5) the name of the prisoner or prisoners to be visited; and
 
 
 46
 (6) the time of exit.
 
 
 47
 (d) Any prospective visitor who is under 16 years of age shall be required to enter in the facility visitors log:
 
 
 48
 (1) the information required in subdivision (c) of this section;
 
 
 49
 (2) his age; and
 
 
 50
 (3) the name, address, and telephone number of his parents or legal guardian.
 
 
 51
 (e) Prior to visiting a prisoner, a prospective visitor under 16 years of age may be required by the chief administrative officer to produce written permission from a parent or legal guardian approving such visit. In the discretion of the chief administrative officer, oral permission from a parent or legal guardian of a prospective visitor under 16 years of age may be accepted.
 
 
 52
 7008.6 Contact visits. (a) Physical contact shall be permitted between a prisoner and his visitors.
 
 
 53
 (b) Prisoners and their visitors shall be required to conduct themselves in a manner consistent with reasonable standards of public decency.
 
 
 54
 7008.7 Visitation security and supervision. (a) All prisoners, prior and subsequent to each visit, may be searched solely to ensure that they possess no contraband.
 
 
 55
 (b) All prospective visitors may be searched solely to ensure that they possess no contraband.
 
 
 56
 (c) Any body search of a prospective visitor made pursuant to subdivision (b) of this section shall be conducted only through the use of electronic detection devices.
 
 
 57
 (d) Personal effects, including but not limited to handbags or packages possessed by any prospective visitor, shall be searched or checked with the visiting area supervising officer.
 
 
 58
 (e) A search of the visiting area shall be conducted prior and subsequent to each visiting period.
 
 
 59
 (f) Supervision shall be provided during visits solely to ensure that the safety, security or good order of the facility is maintained.
 
 
 60
 (g) Supervision of visits shall not include any surreptitious surveillance.
 
 
 61
 7008.8 Limitation of visitation rights. (a) Visitation rights shall not be denied, revoked, or limited based solely upon a prisoner's or prospective visitor's:
 
 
 62
 (1) sex;
 
 
 63
 (2) sexual orientation;
 
 
 64
 (3) race;
 
 
 65
 (4) age, except as otherwise provided in this Part;
 
 
 66
 (5) nationality;
 
 
 67
 (6) political beliefs;
 
 
 68
 (7) religion;
 
 
 69
 (8) criminal record; or
 
 
 70
 (9) the prospective visitor's involvement in any pending civil or criminal proceeding.
 
 
 71
 (b) The visitation rights of a prisoner with a particular visitor may be denied, revoked or limited only when it is determined that the exercise of those rights constitutes a threat to the safety, security or good order of a facility.
 
 
 72
 (c) A prisoner's right to contact visits as provided for in section 7008.6 of this Part may be denied, revoked, or limited only when it is determined that such visits constitute a threat to the safety, security or good order of a facility. Should a determination be made to deny, revoke or limit a prisoner's right to contact visits, alternative arrangements for affording the prisoner visits shall be made, including but not limited to non-contact visits.
 
 
 73
 (d) A prisoner's visitation rights as provided for in sections 7008.3 and 7008.4 of this Part may be denied, revoked or limited in an emergency situation. Within 24 hours after any denial, revocation or limitation made pursuant to this subdivision, the chief administrative officer must apply to and obtain the approval of the State Commission of Correction to continue such action.
 
 
 74
 (e) The provisions of Part 7006 of this Subtitle (Discipline) shall apply prior to any determination made pursuant to subdivisions (b) and (c) of this section.
 
 
 75
 (f) Any determination to deny, revoke or limit a prisoner's visitation rights pursuant to subdivisions (b) and (c) of this section shall be made by the chief administrative officer in writing and shall state the specific facts and reasons underlying such determination. A copy of this determination shall be given to any person affected by the determination.
 
 
 76
 (g) Any person affected by a determination made pursuant to subdivisions (b) and (c) of this section may appeal such determination to the citizens policy and complaint review council of the State Commission of Correction.
 
 
 77
 (1) The person affected by the determination shall give notice in writing to the council and the chief administrative officer of his intent to appeal the determination.
 
 
 78
 (2) Upon receiving any notice of appeal made pursuant to this section, the chief administrative officer shall immediately forward to the council the written determination at issue.
 
 
 79
 (3) The chief administrative officer or any person affected by the determination may submit to the council for their consideration any additional material.
 
 
 80
 (4) The council or its designate shall issue a written decision upon the appeal within 14 days after they have received notice of the requested review.
 
 VAN GRAAFEILAND, Circuit Judge, dissenting:
 
 81
 Once again, this Court, after espousing the doctrine that courts are ill- equipped to deal with the problems of prison administration and that they must not become "surrogate Jail Superintendents for the State of New York", has proceeded virtually as if the doctrine did not exist. My brothers now mandate a district judge sitting in Rochester, New York, to undertake the implementation of a "contact" visitation program in the jails of forty-three counties throughout the State of New York. Expense is to be no deterrent. Whatever the cost to the citizens of these counties, the district court must order it to be incurred. As the majority puts it, "(i)nadequate resources or finances can never be an excuse for depriving detainees of their constitutional rights."
 
 
 82
 At the outset, I question whether this Court should become involved in the matter of class certification at the present time. During the past year, the Supreme Court has held that the rule denying the appealability of class certification orders should not be circumvented by allowing review under the "death knell" doctrine, Coopers & Lybrand v. Livesay, 437 U.S. 463, 98 S.Ct. 2454, 57 L.Ed.2d 351 (1978), or by equating the denial of certification with the denial of interlocutory injunctive relief. Gardner v. Westinghouse Broadcasting Co., 437 U.S. 478, 98 S.Ct. 2451, 57 L.Ed.2d 364 (1978). It is equally important, I believe, that the rule not be emasculated by the simple device of coupling every request for class certification with a motion for preliminary injunctive relief so that the certification order may be reviewed under the doctrine of pendent jurisdiction when the appeal from the preliminary injunction order comes up as a matter of right under 28 U.S.C. § 1292(a)(1).
 
 
 83
 On some occasions, this Court has reviewed non-appealable orders by exercising pendent jurisdiction. See Sanders v. Levy, 558 F.2d 636, 643 (2d Cir. 1976), Rev'd on other grounds sub nom. Oppenheimer Fund, Inc. v. Sanders, 437 U.S. 340, 98 S.Ct. 2380, 57 L.Ed.2d 253 (1978). On other occasions, it has refused to do so. See General Motors Corp. v. City of New York, 501 F.2d 639, 648 (2d Cir. 1974). Because of the danger of abuse in the pendent jurisdiction method of review, See Garner v. Wolfinbarger, 433 F.2d 117, 120 (5th Cir. 1970); 16 Wright & Miller, Federal Practice and Procedure § 3937 at 270-71 (1977), it is a procedural device that should rarely be used. Id. at 271. In Abney v. United States, 431 U.S. 651, 662-63, 97 S.Ct. 2034, 52 L.Ed.2d 651 (1977), the Court recognized the possibility of abuse in holding that interlocutory appellate consideration of the district court's rejection of a double jeopardy claim did not permit the Court of Appeals to consider other claims of error included in the defendant's motion to dismiss.
 
 
 84
 In disagreeing with my brothers, I need not decide whether Abney's stringent holding should be followed in a civil action. I am content to suggest that we should rarely exercise pendent jurisdiction to review nonappealable orders. I am also content to follow the firmly established doctrines that the determination whether an action should proceed as a class action "is one which is peculiarly within the discretion of the trial judge", Becker v. Schenley Industries, Inc., 557 F.2d 346, 348 (2d Cir. 1977), and that the trial judge's findings of fact should not be overruled unless clearly erroneous. Palermo v. Warden, 545 F.2d 286, 293 (2d Cir. 1976), Cert. dismissed, 431 U.S. 911, 97 S.Ct. 2166, 53 L.Ed.2d 221 (1977).[1] With all respect to my learned colleagues, I fear that they are as ready to abandon these valuable precepts of appellate review as they are to ignore their professed sensitivity to the dictates of federalism. For the foregoing reasons, and those which follow, I respectfully dissent.
 
 
 85
 It seems to me that, before we set the district judge to the formidable task of restructuring jails in forty-three counties, we should first define clearly and explicitly the nature of the legal right upon which this extraordinary relief is based. A class action to enforce an undefined and indefinite right is a waste of judicial manpower and taxpayers' money.[2] My brothers should start by stating exactly what they mean by the term "contact visit".
 
 
 86
 This Court has firmly committed itself to the proposition that pretrial detainees have a constitutional right to "contact visits", without ever really stating how much contact there must be in such visits to satisfy the mandates of the Constitution. See Wolfish v. Levi, 573 F.2d 118 (2d Cir. 1978), Cert. granted sub nom. Bell v. Wolfish, --- U.S. ----, 99 S.Ct. 76, 58 L.Ed.2d 107 (1978); Rhem v. Malcolm, 507 F.2d 333 (2d Cir. 1974) and 527 F.2d 1041 (2d Cir. 1975). If we are now going to regulate this aspect of jail management, the time has come to lay the cards on the table.
 
 
 87
 Pretrial detainees, we have said, are presumed to be innocent and therefore have the same rights as unincarcerated persons, except where the exercise of those rights is prohibited by the requirements of jail security. Rhem v. Malcolm, supra, 507 F.2d at 336. The pretrial detainee is to be subjected "to no greater restrictions on his liberty than are necessary to ensure either his attendance at trial or the security of the institution in which he is held." Majority opinion, ante at 1236 n.7. The unincarcerated man has, of course, the right to "kiss a wife, or to fondle a child." But he has more than that. He has the right to kiss a child and to fondle a wife, and he has the right to do so in privacy. See Griswold v. Connecticut, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965). Do our forceful statements mean that a presumptively innocent pretrial detainee is entitled to the same conjugal "contact" rights that he would enjoy were he not incarcerated, so long as the exercise of these rights does not cause a breach in jail security? If, as we hold, pretrial detainees retain "all the rights of an ordinary citizen except the right to go and come as they please", Rhem v. Malcolm, supra, 507 F.2d at 337 (quoting Jones v. Wittenberg, 323 F.Supp. 93, 100 (N.D. Ohio 1971), Aff'd sub nom. Jones v. Metzger, 456 F.2d 854 (6th Cir. 1972)), can the private and intimate contact rights of ordinary citizens be taken from the detainees without a compelling security reason? The only thing preventing the exercise of these rights within jail confines is cost. Extra rooms can be built, and more guards can be hired. This requires money, but the lack of money, we say, does not justify depriving pretrial detainees of their rights under the Constitution.
 
 
 88
 I do not know whether it would be wise to order that the citizens of New York be given complete physical access to their presumptively innocent spouses who are awaiting trial in jail. I would prefer to leave that decision to the officials of the New York correctional system, who are more knowledgeable than I in the field of penology.[3] However, wisdom and judicial concepts of constitutionality do not always go hand in hand. My brothers have decreed that the constitutional rights of pretrial detainees are, except for security reasons, the same as those of men who are not imprisoned. Having proclaimed that to be the law, my brothers should now declare whether the pretrial detainees' constitutional rights to "contact with their loved ones" are the same "contact" rights they would have if they were not imprisoned. The people of Monroe County and New York State are entitled to know this now, not to learn about it in installments. Moreover, Judge Burke should be provided with guidance if he is to attempt to carry out the mandate of this Court.
 
 
 89
 Carrying out this Court's mandate will not be a simple and inexpensive matter. For example, at the same time my brothers hold the right to contact visits to be "founded on the bedrock of our criminal jurisprudence", they say that pretrial detainees can be deprived of this valuable constitutional right through "classification" schemes designed by jail officials to weed out security risks. They do not explain how state officials can create a workable "classification" scheme for a group of pretrial detainees, all of whom are presumed to be innocent, that will mark one as a security risk and not another.[4] They likewise do not state how the valuable constitutional right to contact visits can be taken from any detainee without the trappings of due process. See, e. g., Cardaropoli v. Norton, 523 F.2d 990, 994-97 (2d Cir. 1975); Sostre v. McGinnis, 442 F.2d 178, 196 (2d Cir. 1971), Cert. denied, 404 U.S. 1049, 92 S.Ct. 719, 30 L.Ed.2d 740, 405 U.S. 978, 92 S.Ct. 1190, 31 L.Ed.2d 254 (1972). Inevitably, the district court will become involved in the "minutiae" of jail administration as federal courts have done whenever they have undertaken to prescribe the constitutional rights of inmates. See, e. g., Todaro v. Ward, 565 F.2d 48 (2d Cir. 1977).[5]
 
 
 90
 I am satisfied, moreover, that the cost of implementing the majority's program in all the jails of New York will be high. I am more influenced than my brothers by the district court's finding that the cost of undertaking simply a "shake a friend's hand" and "kiss a wife" program in the Monroe County Jail would be $750,000, "$500,000 of which would be directly related to the cost of personnel and daily operation of such jail facility which would be a continuing and increasing cost."[6] If my brothers really mean it when they say that pretrial detainees are to be given "all the rights of the ordinary citizen except the right to come and go as they please", the cost of a statewide program permitting the exercise of such rights will be astronomical.
 
 
 91
 This Court is now entering a new area of state prison regulation. We have made many broad and categorical statements about the rights of pretrial detainees. If we mean what we have said, let's bite the bullet and order appropriate relief. If we actually mean something less, let us confess to exaggeration. In either event, let the correctness of our decision be contested in an arena that does not encompass forty-three separate counties. If we are wrong in whatever constitutional interpretation we make, our error will not have disrupted unnecessarily all the jails in the State of New York.
 
 
 
 [1]
 Under N.Y. Correction Law § 500-c (McKinney Supp.1978), the sheriff is responsible for the custody of pretrial detainees in every county except Westchester and the five in New York City
 
 
 [2]
 These regulations are reprinted in the Appendix to this opinion
 
 
 [3]
 The Appellate Division decided that although the regulations were within the scope of the Commission's authority, 406 N.Y.S.2d at 559-60, there was a reasonable probability that they would create sufficient costs and hazards to security to render them in conflict with the statutory duties of the sheriffs regarding safekeeping of prisoners, Id. at 561. The state court did not address any federal constitutional issues
 
 
 [4]
 The class was defined to include those counties that neither permit contact visitation nor are the subject of pending litigation seeking to require them to do so. These counties are: Albany, Oneida, Rensselaer, Montgomery, St. Lawrence, Jefferson, Warren, Franklin, Clinton, Columbia, Greene, Herkimer, Fulton, Essex, Lewis, Schohaire, Hamilton, Monroe, Onondaga, Niagara, Oswego, Orleans, Ontario, Cayuga, Madison, Wayne, Seneca, Livingston, Genesee, Cortland, Wyoming, Yates, Sullivan, Cattaraugus, Rockland, Steuben, Tompkins, Delaware, Schuyler, Otsego, Chenango, and Putnam
 At the time the district court entered the order under consideration here, the sheriff of Orange County did not permit contact visitation in his jail. Since that time, however, a consent decree has been filed in another action that requires implementation of contact visitation in Orange County. Merriweather v. Sherwood, No. C.A. 77-3421 (E.W.), consent judgment at 36-39 (S.D.N.Y. Oct. 27, 1978). Accordingly, Orange County has been deleted from the definitions of the plaintiff and defendant classes.
 
 
 [5]
 The other defendants are Stephen Chinlund, Joseph Wasser, and Dorothy Wadsworth, who were respectively Chairman and Members of the State Corrections Commission at the time the suit was commenced. The complaint sought to direct these defendants to implement contact visitation throughout the state, but the possibility of such relief has been aborted by the McNulty action. It would be both unseemly and a possible violation of the Anti-Injunction Act, 28 U.S.C. § 2283, for a federal court to require the commissioners to do that which a state court has forbidden. In view of our holding in Part I Infra that possible expenditures required to implement contact visitation are not relevant constitutional considerations, the Appellate Division may be inclined to reconsider and modify its decree. Cf. note 3 Supra. That is, of course, a determination to be made by that court, and we will not require the commissioners to act inconsistently with the state court's injunction
 
 
 [6]
 By "statewide class," of course, we refer to those pretrial detainees held in the jails of the 42 counties listed in note 4 Supra
 
 
 [7]
 In addition, Judge Burke found that the county legislators were indispensable parties because any relief would require appropriation of funds. This was error. Federal courts will not, except in the most extreme circumstances, direct state officials to raise or spend money, but will simply enjoin continuation of unconstitutional acts. Rhem I, supra, 507 F.2d at 340-42 & nn. 19 & 20
 And, although not requested to do so by either plaintiffs or defendants, the district judge included in the plaintiff class sentenced offenders incarcerated in Monroe County Jail. This was a clear abuse of discretion. Whatever constitutional right a sentenced offender may have to contact visitation and we express no view on the issue is primarily a matter of the Eighth Amendment's prohibition of cruel and unusual punishment. This question is fundamentally different from the due process right of the pretrial detainee to be subjected to no greater restrictions on his liberty than are necessary to ensure either his attendance at trial or the security of the institution in which he is held. Wolfish v. Levi, supra, 573 F.2d at 124-25; Rhem, I, supra, 507 F.2d at 336 n. 5.
 
 
 [8]
 Although denial of class certification is not an appealable order, Gardner v. Westinghouse Corp., 437 U.S. 478, 98 S.Ct. 2451, 57 L.Ed.2d 364 (1978), Judge Burke's ruling on the motion for a preliminary injunction accords us jurisdiction under 28 U.S.C. § 1292(a)(1). We may, in our discretion, review the entire order appealed. Sanders v. Levy, 558 F.2d 636, 642-43 (2d Cir. 1976), Adhered to on point en banc, 558 F.2d 646, 647-48 (2d Cir. 1977), Rev'd on other grounds sub nom. Oppenheimer Fund, Inc. v. Sanders, 437 U.S. 340, 98 S.Ct. 2380, 57 L.Ed.2d 253 (1978); General Motors Corp. v. City of New York, 501 F.2d 639, 648 (2d Cir. 1974); See San Filippo v. United Bhd. of Carpenters, 525 F.2d 508, 513 (2d Cir. 1975)
 The facts of this case strongly militate in favor of review. Both Sanders and General Motors stress that "(t)he guiding principle to inform the discretionary application of pendent (appellate) jurisdiction is whether review of the appealable order will involve consideration of factors relevant to the otherwise nonappealable order," 501 F.2d at 648; Accord, 558 F.2d at 643. Here, as shown in Parts I and II of this opinion, the district court's rulings on both the preliminary injunction and class certification motions reflected the same fundamental error concerning the nature of the right to contact visits. Moreover, when this case was last before us, Marcera v. Chinlund, 565 F.2d 253 (2d Cir. 1977) (Per curiam ), we exercised our discretion in favor of reviewing the class determination. Considering our obligation to protect our mandate, it would make little sense to deny similar review now.
 The dissent's citation of Gardner, supra, and Coopers & Lybrand v. Livesay, 437 U.S. 463, 98 S.Ct. 2454, 57 L.Ed.2d 351 (1978), is somewhat disingenuous. Not only did the Court in Gardner explicitly avoid reaching the jurisdictional issue now confronting us, 98 S.Ct. at 2453 n. 3, but the factors supporting the rejection of the death knell doctrine in Coopers & Lybrand have little relevance to the instant case. Thus, the administrative difficulties inherent in permitting appellate jurisdiction to turn on delicate factual determinations, 98 S.Ct. at 2460-61, are not present where, as here, jurisdiction already exists under § 1292(a)(1). Moreover, motions for preliminary relief themselves entail "considerations that are 'enmeshed in the factual and legal issues comprising (sic) the plaintiff's cause of action,' " Id. at 2458 (quoting Mercantile Nat'l Bank v. Langdeau, 371 U.S. 555, 558, 83 S.Ct. 520, 9 L.Ed.2d 523 (1963). Pendent review of a class determination involving the same issues, therefore, would be a wise and time-saving exercise of our discretion.
 
 
 [9]
 Neither Marcera nor Dillman is currently an inmate of the Monroe County Jail. Nevertheless, because of proper plaintiff class exists, the action is not moot. Marcera v. Chinlund, supra, 565 F.2d at 255 (citing Gerstein v. Pugh, 420 U.S. 103, 110 n. 11, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975))
 
 
 [10]
 We recognize that this case is not precisely congruent to the usual suit against a class of local public officials. Plaintiffs here are not attacking the facial validity of a locally administered statute of statewide effect, See, e. g., Washington v. Lee, 263 F.Supp. 327 (M.D.Ala.1966) (3-judge court), Aff'd per curiam, 390 U.S. 333, 88 S.Ct. 994, 19 L.Ed.2d 1212 (1968), but rather a series of similar administrative practices. Nevertheless, the distinction is immaterial under the facts of this case. The challenged behavior of the 42 sheriffs denial of contact visitation is identical; it could not be more so were they acting pursuant to statute rather than their own administrative policies. Since declaratory and injunctive relief is sought against identical behavior, we conclude that this case is a proper (b)(2) defendant class action
 
 
 [11]
 In addition, the sheriffs argued that under the New York Constitution and various state statutes, the Corrections Commission was without authority to issue the regulations it did. See 406 N.Y.S.2d at 558. These claims are clearly irrelevant to the federal constitutional issues presented in the instant case, for a state may not violate an individual's due process rights with impunity merely by dispersing authority among its officials in such a way that no one has the power under state law to remedy the violation
 
 
 [12]
 We are not unmindful that when an action has become moot to the named plaintiffs, See note 9 Supra, Article III's case or controversy requirement imposes on us a heightened duty to ensure that the case will be prosecuted vigorously. Cf. Sosna v. Iowa, 419 U.S. 393, 403, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975). But where, as here, the class attorneys are experienced and able public interest lawyers, that duty is easily met. The very Raison d' etre of the Monroe County Legal Assistance Corp. is to bring suits of his nature, and it is clear that counsel have a continuing and abiding interest in the success of this litigation. Compare Gerstein v. Pugh, 420 U.S. 103, 110 n.11, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975) (public defenders)
 
 
 [13]
 It may be argued that we should not grant relief without first affording notice to the sheriffs. We conclude, however, that prior notice is required by neither Rule 23 nor the due process clause. Rule 23 does not require notice to (b)(2) plaintiff classes, Sosna v. Iowa, 419 U.S. 393, 397 n.4, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975); Frost v. Weinberger, 515 F.2d 57, 65 (2d Cir. 1975) (Friendly, J.), Cert. denied, 424 U.S. 958, 96 S.Ct. 1435, 47 L.Ed.2d 364 (1976), and the text of the rule does not differentiate between plaintifff and defendant classes on the issue of notice. Moreover, due process permits binding absentees to a judgment with respect to common questions of law if they have been adequately represented in the suit. Hansberry v. Lee, 311 U.S. 32, 61 S.Ct. 115, 85 L.Ed. 22 (1940). In the class action context, notice is simply a means for assuring such adequacy, not an end in itself. Note, Supra, 91 Harv.L.Rev. at 646 n.86. Here, representation of the defendant class has been more than adequate, and the substantive law governing the case is clear. Thus, we are persuaded by Lynch v. Household Finance Corp., 360 F.Supp. 720, 722 n.3 (D.Conn.1973) (3-judge court), that notice of the preliminary injunction to be entered on remand is sufficient under the facts of this case
 
 
 [14]
 We do not believe such assistance is barred by the terms of the preliminary injunction entered in the state court McNulty action, for that decree merely precluded implementation of the Commission's jail regulations and did not, as we read it, purport to limit the Commission's statutory authority to provide technical aid to administrators of corrections facilities. N.Y. Corrections Law § 45(2), (11) (McKinney Supp.1978)
 
 
 [15]
 Even in Monroe County, where Sheriff Lombard testified to an estimated cost of $750,000 for implementation of contact visitation, other evidence suggests that the price could be far less. All that may be required may be to remove the wall bisecting the current visiting area, purchase a few articles of electronic security equipment, and make a modest addition to the security staff
 We note in passing that our dissenting brother has misstated the record on this point. Judge Burke did not find that the price tag for implementing contact visitation in Monroe County would be $750,000; rather, he merely noted the sheriff's "rough estimate" to that effect. Finding of Fact 8, Jt.App. 177. The sheriff's estimate is hardly binding on us under the "clearly erroneous" rule of Fed.R.Civ.P. 52(a).
 
 
 [16]
 This disposes of the cross-appeal by Sheriff Lombard as well as the principal appeal by plaintiffs
 
 
 [1]
 Without belaboring the matter, I point out that the district court made factual findings that Sheriff Lombard was not representative of all the sheriffs and would not adequately represent them and that the two young lawyers seeking to represent the plaintiff class would not adequately do so
 
 
 [2]
 Unlike the court in Washington v. Lee, 263 F.Supp. 327 (M.D.Ala.1966), Aff'd, 390 U.S. 333, 88 S.Ct. 994, 19 L.Ed.2d 1212 (1968), we are not dealing here with a simple issue, such as the constitutionality of a statute requiring racial segregation in prisons and jails
 
 
 [3]
 Penal authorities in several countries permit prisoners to continue conjugal relationships with their spouses. See Jacobs & Steele, Sexual Deprivation and Penal Policy, 62 Cornell L.Rev. 289, 297-98 (1977). However, most American courts have not yet seen fit to treat this as a fundamental right for convicted prisoners. See Wolfish v. Levi, 439 F.Supp. 114, 142-43 (S.D.N.Y.1977). This Court, at 573 F.2d 118, affirmed Wolfish in part and reversed it in part but held specifically that pretrial detainees have a First Amendment right to contact visits. See id. at 126 n.16
 
 
 [4]
 Although this Court has previously approved the use of a "classification" system, See Rhem v. Malcolm, supra, 507 F.2d at 338, it has never discussed the criteria to be considered in the creation of classes. I suggest that an attempt to classify detainees on the basis of their previous record, the nature of the crime with which they are charged, or some similar criteria, would result in so many exceptions as to make the entire scheme worthless. In the final analysis, a jail superintendent who would deprive a detainee of the right to contact visits must do so on the strength of his own honest belief that he is avoiding those "demons violence and contraband."
 
 
 [5]
 When this Court holds, as it did in Todaro, that the Constitution requires nurses in a prison infirmary to make rounds every two hours, it is not exactly avoiding "minutiae"
 
 
 [6]
 Without even discussing the clearly erroneous rule, my brothers state that other evidence "suggests" that the price could be less